On the docket, 2-017-0923, Alex Ellison, Mark McMillan, and Stephen Johnson, plaintiffs, and J.P. Thiller and Thiller's associates, and Dave O'Brien have passed. Filing in on behalf of the plaintiff's appellant, Mr. Peter T. Smith. Filing in on behalf of the defendants, please, is Hannah O'Hanlon. Good morning, counsel. Mr. Smith. Justice Zinoff, Justice Jurgensen, and Justice Shostak, may it please the court. I'm Peter Smith. I am counsel for the appellant Stephen Johnson in this. Amanda Hamilton, counsel for the appellee J. Thiller. This is an appeal of an interlocutory order from Judge Caldwell of Henry County, dismissing count one of Stephen Johnson's complaint, which was directed against J. Thiller. And that complaint was for aiding and abetting by Mr. Thiller. Mr. Thiller had prepared a will and a deed with regard to Stephen Johnson's father's property, and also a deed that was prepared but not filed with regard to Ruth Johnson's trust property, which Stephen Johnson was vested in. Because this is an interlocutory appeal, I'd sort of like to bring you up to date on the status of what's been happening in the trial court. I believe it's appropriate considering the nature of the appeal. Judge Caldwell has since retired. Judge Costello has been assigned to the case. Thiller and O'Brien have filed motions to dismiss on the Fourth Amendment complaint, and those have been decided. Two of them, pursuant to 2619, were denied on the settlement issue, the Cheney case that we have in this case, and also on the probate issue, the Phelps case that we also have in this case. The motions to dismiss based on 2615, the sufficiency of the pleadings, were granted, but all were given leave to amend without prejudice. The case that we have before us is one that actually seems to have seven different issues, four of them under 2619 and three of them under 2615. With regard to the issues under 2619, three of those actually have to do with the oral order that Judge Caldwell issued in the case. The first of those is that the complaint does not clearly allege tortious actions by Thiller, for example, on to influence fraud and duress. The second is that the complaint is barred by the Cheney decision, the one with regard to settlement. And third is that there is no cause of action stated because of lack of existence of a duty by Mr. Thiller. There is an additional 2619 issue in this, but it is in arguments and issues that Thiller's brought up as additional reasons for the court to sustain the decision below. In other words, we have a de novo review here, and so if none of these first three can be supported, then the other allegations, the other issues that they've brought up, they feel that they'd like the court to consider those and to affirm the decision below based upon those. With respect to the first basis the trial court addressed and the allegations in the complaint, was it sufficient to allege that Thiller, the attorney, should have known as opposed to actual knowledge of the tortious activity? Now I know the trial court found something different and said that actually I believe Thiller had to have participated in this tortious activity or been directly responsible for any undue influence, but what is a sufficient allegation under these facts? Your Honor, the full phrase, as I recall it, is knew or should have known. And we believe that that's a sufficient allegation because in the area of undue influence, it's frequently circumstantial evidence that is the principal cause. And in fact, circumstantial evidence is sufficient to prove an undue influence allegation. So here, what was the circumstantial evidence? Was there anything alleged that amounted to this circumstantial evidence? Yes, and I believe that within the brief we've recited in pretty much detail with regard to that. I could dig quickly through my paper and bring that up to you and read it for you. But what it really comes down to is the actions of Carolyn Schultz, who is what we allege to be the perpetrator of the undue influence, the actions of Carolyn Schultz in all of the things that she did and controlled for her father. She was his power of attorney for 10 years for health care and for property. She was instrumental in negotiating a termination of a partnership that Stephen Johnson had with his father, Lawrence, and pretty much directed that. All of these are circumstantial. She would go on vacations with her father, bringing her family. Her father would pay them in their entirety. Her father was normally a very frugal man. Shouldn't have been doing those things. She was the one who first went to Jay Filler and said, My father would like to have a new will prepared. Now, did he know the family? Does the record show that he had been a lawyer for this family for a long time and that he was aware of the parents' intent or the father's intent with respect to his children and the estate? For many, many years had been a man in Belvedere whose name escapes me at this point.  Kurt Tobin. And Carolyn Schultz directed her father away from Kurt Tobin because of Kurt Tobin's history with him. And so she went to Jay Filler. With Jay Filler, it wasn't just the will and the trust that Carolyn Schultz dealt with. The will and the trust were what she came to Jay with and said, This is what we want. Not her father first. Her father came later. What were the significant differences between the 2011 and 2013 will? Wasn't Stephen pretty much disinherited in 2011 by Mr. Tobin? I'm sorry, by the document drafted by Mr. Tobin? There had been a family meeting. And at that family meeting, Lawrence had said, and this is a paraphrase, I've been generous to my son, Stephen, and I want to make my distributions equal within the family. Didn't say it was going to cut him off completely. Simply said, I'd like to make these substantially equal. And in the 2011 will that Tobin had prepared, there was a section 2.1 that dealt with personal property. And 2.1 left equally the personal property to all of the children, including Stephen. 2.2 dealt with the residue of the property. And for the residue of the property, he did indeed remove Stephen. And he does have a statement that says, I've been generous to Stephen. I purposefully not left him anything. But he did not in 2.2 refer to the personal property. Doesn't it say in this will, that sort of global language regarding the statement about Stephen with respect to this will? It does say that in 2.2. Right, how do we read that narrowly? It doesn't say, I mean, the will is the entire document, right? Well, it could. But it's not, it's in the section on residue. And one of the things that's supposed to be done in a will construction is to sort of give effect to all of the language, if possible. And if we're to give effect to the language in 2.1, then the language in 2.2 concerning disinheritance has to be read only with regard to the residue. Would you consider that ambiguous? I would consider the way that it has been handled to be ambiguous, yes. But if you go back and you consider what Lawrence's purpose was from that meeting with Tobin, it was to equalize. It wasn't to disinherit. And it's with the residue that you really equalize, not with the memorabilia. I'm not a probate lawyer, but I don't know that that's how you equalize. How do we know what Lawrence was thinking when he says to the rest of his family, I want to equalize it. I've given Stephen X. How do we know? Does that make it ambiguous? The majority of the property was in farmland. And that's where the value of the estate was. And that's where he removed Stephen. And that's where the equalization was. The personal property was just a matter of trinkets and things of sentimental value? The personal property did have trinkets. It did have memorabilia. It did have pictures. It did have all those things. But apparently, Lawrence also liked gold. And so he had been buying gold. And I haven't been able to do any discovery yet, so I don't know this. But he probably had around $10,000 in gold bars. If this is ambiguous, or these questions that are being asked of you and we're talking about here today, would those be questions of fact or a trier of fact? They would be. And one of the things that did not occur in this was Judge Caldwell, when he made his decision, did not make any reference to 201, 202, construing the will. And he really took no action with regard to that. But shouldn't we assume he took the appropriate things into consideration? Well, yes. I mean, isn't that what we're supposed to do with the trial court? That is what the trial court is supposed to do. It was not done in this situation. Respectfully, did you ask for specific findings? I did not. Okay. And no one else did either. But isn't the status of the record on the burden of the appellant? Say that again? The status of the record, making a complete record, isn't that your burden? It is. Both in the trial court? It is. Okay, fair enough. And, you know, we came back with a motion to reconsider. And with the motion to reconsider, Judge Caldwell's response was, and we pointed out the 201, the presence of that, was simply, I think I got it right the first time with no explanation and no consideration of 201 and 202 and construction of the will. With regard to the allegations, with regard to the order of Judge Caldwell, the first thing that he went to was that Filler's conduct, Filler's conduct was not tortious. It was not pled or shown to be fraud, duress, or undue influence. Did it have to be under the law? Under the law, no, it did not. In fact, under the law, for aiding and abetting, three elements. First, the party whom the defendant aids must perform a wrongful act which causes an injury. Second, the defendant must be regularly aware of his role as part of the overall or tortious activity at the time he provides assistance. And third, the defendant must knowingly and substantially assist the principal violation. It's not that the aider and abetter is to be committing the tortious activity. That's for the principal in this. And for that reason, Judge Caldwell was wrong in his oral opinion with regard to that issue. What is your response to, if I can ask right now, is the agreement and that, you know, your opponent indicates that the agreement, the settlement agreement, looking at the attorney case, you know, he forfeited that, he gave that up by agreeing, settling out with everyone else, and therefore settling out with everyone else is therefore settling out with Filler, leaving no cause of action. Well, with regard to that, the settlement agreement specifically exempts both Filler and O'Brien from the settlement. They were not a part of it. Nice full paragraph in detail with regard to that. Now, the Cheney case involved a situation in which there was no such general, there was a general release, there was no such specific reservation. And the rule of law that Cheney had was actually this, the unconditional release of one of two or more joint tort feasors or other tort feasors unless a contrary intent appears from the face of the instrument would release all. They clearly reserve. It's clearly reserved. And if you go back and you look at the cases where it is reserved, it historically has been considered to be a covenant not to sue rather than a full release because it's obvious that the intent of the people giving that release was not to release everyone, but instead only a few. Now, the Joint Tort Feasor Act also plays into this. The Joint Tort Feasor Act specifically allows a partial release, basically. And the Joint Tort Feasor Act does require that there be a good-faith hearing. There was a good-faith hearing here. And one of the positions we have with regard to that is that the Joint Tort Feasor Act does apply, and so this is one in which there has been a proper reservation against both O'Brien and Filler. Thank you, sir. Thank you very much for your time. Ms. Hamilton. Good morning, Justices, Counsel. May it please the Court. This case is about whether the plaintiff, whom I'm going to refer to as Steven, and I need no disrespect, but when every individual involved seems to have the last name, it's difficult to say, Mr. Johnson, whether Steven has the ability to claim damages resulting from an estate plan when he had already been disinherited by a prior will. And, Justice Gergenson, I know that that was something that you had asked about, and I'm glad because that's the first point that I'd like to make, is that Steven, in this case, had absolutely no expectancy. Well, how was he disinherited when you look at, was it 2.1 and 2.2? As Counsel explained, you have the personal property, and then you have the real estate. He was disinherited from the real estate, but wasn't he still under 2.1 to be divided by 5? No. Respectfully, Justice, I don't believe so. And the reason I'm basing this conclusion on plaintiff's actual own allegations, if you look in the record of C-1735, Steven actually explains that as far back as in 2001, Lawrence, the father, attended this, or he began becoming suspicious of Steven, and specifically Steven's son, Grant, who was worried that Grant was going to be selling the family farm. He wanted to make sure that Grant and Steven could not get any of his assets. He also then has a family meeting in 2004 where he explains to everyone, he sits down, and this is Steven's allegation, that Lawrence has handwritten calculations, and I'm reading, Lawrence presented his handwritten calculations showing that during Lawrence's lifetime that would exceed what his other children would receive upon his death. Did this evidence come in at the hearing? I believe it did, Judge. It was part of the record. It was part of the argument in the motions to the Smith. But we don't even actually have to go that far. If you look at the actual 2011 will, again, the Illinois Supreme Court in Packard v. Denman and in Harris v. Donovan has been very clear that, obviously, the goal is to give effect to the test shirt's intent. And whenever possible, you should construe all provisions. If it's possible to construe all provisions of a will such that none of them contradict one another, that is the interpretation that should be given. It is a question of law, respectfully. It's not a question for the jury. It's not a question of fact. Will construction is questions of law left for the court. In Harris and in Pack, the Illinois Supreme Court discussed when an interpretation of a will is given or proposed to the court, where, for example, in Pack, the interpretation suggested by the appellant to give effect to the third, fourth, and fifth clauses would mean ignoring the plain language of the sixth clause. The Illinois Supreme Court rejected that, said you can't do it. In Harris, they discussed how a general bequest of my children, generally, was not enough to overcome the remainder of the express provisions of a will. In this 2011 will, you have the same situation. You have a class gift, essentially in 2.1, that talks about my children as to the personal property. Interestingly, it also mentions that it's only involved that children can agree. And if the children can't agree, then that ultimate decision is left to the executor, who happens to be Carolyn. But doesn't this leave some ambiguity with respect to these portions of the will? And when you have ambiguity, then what happens? When you have ambiguity, the court is required to examine the document, the four corners, and then would also consider extrinsic evidence. It would allow extrinsic evidence. Absolutely. So how do you get to that point when you grant the 2615? I don't think there's any ambiguity here. I think subsection D says under this will. I have intentionally not provided for distribution under this will for my son, Stephen Willis Johnson. Then gives substantial reasonings why. I have made substantial gifts to him over the years, and after reviewing the value and nature of my estate, his inheritance under my deceased wife's estate and gifting down through the years feel that he has been fairly and adequately compensated. So how is that a disinheritance? I mean, isn't what was done here, just as Lauren said, a vehicle or these wills were vehicles to equalize the distribution rather than seeing Stephen as being disinherited? That's actually an excellent point, Justice Enum. Essentially, I think Lawrence was saying, I don't want Stephen to receive anything else under this estate plan because he's already received more than his fair share of my estate in the form of gifts, in the form of other things that were given to him while Lawrence was alive. So I don't believe there's any ambiguity. I think that that expression, under this will, eliminates, whether it's in subsection A, B, C, D, 6th clause, 7th clause, it specifically says under this will. I think his intent is clear. And just as in Packen and Harris, this specific language overcomes any general bequests or sort of an implied bequest such as the class gift in 2.1. Again, I think you get to, there's, you know, throughout plaintiff's pleadings in this case, and obviously there's a very lengthy record on appeal, but plaintiff details all of the animosity that existed between him and Caroline. I don't, or Caroline, I don't believe that, you know, the Illinois Supreme Court has set a very high standard for what constitutes an expectancy. That's plaintiff's burden in this case, to prove that he had a genuine expectancy. I don't see how he gets that from 2.1, particularly when there's this express language later on in the will saying he's not to receive anything under this will. And when the personal property specifically says it's only if all children can agree, and if nobody can agree, then Caroline gets to have the final say. But 2.1 says in equal shares to all of my children. There's no disinheritance clause in 2.1, right? That is correct. And there's no reference in 2.2 to 2.1. I would disagree with that because I believe that in 2.2 subsection D, the phrase under this will means that that section is applied to the entire document. I think that's ambiguous, don't you, as to whether or not he intended to disinherit him from the remainder of the state or just the remainder of the tangible personal property. I mean, can't you say that's ambiguous? I don't believe it's ambiguous, Judge, but even if it were to be construed as ambiguous, I think then you look at the extrinsic evidence that is presented, such as in Stephen's petition to contest the validity of the will, where he goes through, and again this is at C1735, he goes through saying that as early as 2001, Lawrence had some bad feelings toward Stephen and Grant, and he wanted them out of his estate plan. Then he has this family meeting in 2004 and reiterates, I've already given Stephen and his family all that they deserve. They probably get more than what any of my other children are going to get in my passing. I want to revise my will. Then in 2011, he has this meeting with Mr. Tobin. Now, keep in mind the Johnson defendants, the filler defendants are not even involved at this point. This is all happening years before my clients even came on the scene. Right. So the problem that I'm having is that, first of all, I don't think we even get to what my clients did or didn't do or what they knew or what they should have known because I don't think Stephen has an expectancy. But even assuming that Stephen could somehow overcome that hurdle, my second point is that there's just no facts establishing the principal violation against Caroline. How about circumstantially and the totality of the circumstances? That's certainly something that is examined in terms of the undue influence claim. The case that's cited and relied upon by a plaintiff is the DeHart case, and I'm pretty familiar with that case because it comes up a lot in estate planning, we owe malpractice or breach of fiduciary duty claims, et cetera. But DeHart is very important if you look at all the facts of DeHart. You have an 83-year-old man who marries a 53-year-old woman, and within months of their being married, she becomes joint tenants on every single thing he owns, and eventually convinces him that he doesn't really have a son who is actually older than her at the time. She uses her power of attorney to sell the family farm. She lies to the older gentleman saying that the plaintiff isn't really your legitimate son, throws away cards, destroys phone call records, things of that nature. Well, isn't an extreme as the DeHart case? As the coach in Rocky said, women weaken legs. But in this particular case, I mean, you have the fact that she was his personal caretaker. She had his checkbook, his credit cards, his car keys. She isolated him from the other children. Aren't these, you know, the confidence in her relationship with him, and isn't this enough to show that she was in a position of control over him? I don't believe the facts are specific enough as to get to that level, no. Having him your power of attorney or going on vacation, it does not rise to the level of undue influence, which, you know, as the court has defined, is when your freedom is destroyed. I don't believe that there is evidence that he was completely secreted away from everyone else, although Stephen did allege that at one point Lawrence just didn't want to see Stephen or Grant, didn't want them on the property, was very concerned about the family farm. How about the rest of the siblings? The rest of the siblings, I believe some of them were still in contact with Lawrence at the time. At that time? At the time that the undue influence was allegedly being exerted. So I don't think it rises to that level. But again, that's the second hurdle. Yeah, but then those are issues that really need to be heard to determine whether or not there was undue influence. I believe that the plaintiff would have been required to plead additional facts as to get to that point. What about the knowledge? Doesn't your plaintiff have to have knowledge at the time of the acts that constitute aiding and abetting? Yes, and that's actually the third hurdle that the plaintiff, I don't believe, can overcome. Is that actual knowledge? It is actual knowledge. Not constructive. I don't believe constructive gets you there. This court found in the Time Savers, Inc. v. LaSalle case, that was the case where there was the two partners who owned the corporation and then one partner began embezzling and using LaSalle Bank to, you know, writing letters of direction, hey, transfer this money out of this account into this other account that I'm only on. And the other partner eventually found out, filed a claim for aiding and abetting against LaSalle saying, well, you should have known. I mean, you had all these documents saying this money was going here and there and everywhere. You knew that I was not on these accounts. You had constructive knowledge. You should have known. And you should have known doesn't get you there for aiding and abetting. Well, how do you distinguish the white case that you're calling the white one? Yeah, the white case is, I mean, it is a case from 1906 out of the 3rd District, and I was a little bit depressed to learn that people were even trying to defraud people even in 1906 over patents on farms, swinging gates, but they were apparently. So this was a situation where the people who were accused of aiding and abetting were actually getting commissions for, like, bringing in more customers. So essentially the two people who were aiding and abetting the fraudster were going out and soliciting potential customers and referring them to, hey, this guy's got a great deal if you buy in. He owns this great patent on a farm swinging gate. You can make a ton of money. And then every customer that they referred, they got a kickback. But how about the fact that Mr. Filler was going to, was it Larry or Lawrence, saying, hey, why don't you sell off this 50% that is owned by Stephen? You have a right to do that. You can do that. What do you make of that? I don't think that that is actual or constructive knowledge of any alleged misconduct on the part of Carolyn. And that's not, the claim against my client is aiding and abetting. There is no claim that my client. So he didn't aid or abet. He went and did that on his own. Is that what you're saying? No, I don't think that's the case at all. But I think that. Who told him, go ahead and ask Stephen to sell, or Lawrence to sell off Stephen's property that Stephen owns as a result of the trust that was left by his mother? I don't know who may or may not have suggested that. So that's not any evidence of aiding or abetting? I don't think so, no. I think that in this situation, you know, the attorney, my client was the attorney and fiduciary for Lawrence. And Lawrence wanted a new estate plan. And Lawrence was very clear in what he wanted. And that's what my client did. I don't think that it's fair to hold an attorney to the standard of, now even in a very, very complex and contentious family dispute, is it the attorney's responsibility to start investigating all of the different moving parts of the siblings' disagreements and who wants to do what and what. The attorney is responsible for communicating with Lawrence, finding out what Lawrence wants, and making sure that that is reflected accurately in a document. And that's what my client did. Well, who brought Lawrence to him? Drove him to the meeting. I believe it was alleged that it was Carolyn that drove him to the meeting. Didn't Carolyn go to the meeting, go meet with Filler by herself before she ever brought Lawrence there? I don't recall if that was an allegation. And you're saying as a probate attorney you don't have an obligation to look into the reasoning for people asking for things, but don't you think in a case where you have an elderly gentleman whose daughter comes in, let's argue she came in first, said I'm going to bring my dad in, and then brings in an elderly gentleman and starts to disinherit everyone and exclude everyone from his life, wouldn't you as a probate attorney, wouldn't a light bulb go on? I think, yeah, a probate attorney absolutely has a duty to be aware of some of those things. I don't think that that's the case in this instance. I don't believe that he disinherited everyone. And, again, this 2011 will, Stephen, which is the only claim we're actually dealing with here today. We're only dealing with Stephen's claim today, but to take into consideration, to determine whether or not there was any aiding or abetting, we can take into consideration the other siblings, can't we? You can, Judge, and if I may just finish. I think that in that situation, the attorney has a responsibility to make sure that the client who's preparing the estate plan is of sound mind, that he or she knows who they are, where they are, the extent of their bounty, and this is from the case law, the extent of their bounty, how they want that to be distributed. It is now the attorney's responsibility to inquire as to the reasons why. Someone can come in and say, I just don't want to do this. I'm not required to air all of my family skeletons or issues to you. If I don't want this person to have anything, that's really the end of it. I do think that my client did a good job. I do think that my client did due diligence in terms of preparing what this gentleman wanted, and, again, I think that the 2011 will makes it such that this particular plaintiff just simply doesn't have standing and can't demonstrate damages. Thank you. Thank you. Thank you very much. At this point, we'll hear from Mr. Smith. Just briefly, Justices, with regard to the discussion on the will, please remember that not only have we alleged that the will was bad, but that there was a deed in transfer of property, and that also is one of the matters of issue here. Are you talking about the one that was never acted on? No, I'm talking about the one from Lawrence, in which he transferred his property to Carol Schultz's son, James Schultz, Jr., and 50% of that was a non-divided 50% of his property. And what that did was make it unsalable. It was also then leased at a below-market lease rate for what was euphemistically called 10 years. It was actually 10 years with no opportunity to terminate during that 10 years and a second 10 years, and then automatically renewed after that. Did you allege anything in your complaint about this lease being undervalued? Yes, repeatedly, and it's one of the damages that we've in fact requested. A second matter here, counsel has argued that the facts, the allegations with regard to Carol and Schultz were inadequately insufficient. I need to point out to the court that that issue was never raised by Filler in the court below. Which issue? The issue with regard to sufficient facts to support Carol and Schultz's undue influence. It was not raised by Filler in the court below. It was raised for the first time here in the appellate court. Isn't the corollary issue of all those facts, whether or not they're enough, doesn't Filler have to be actually aware of the undue influence? He has to have knowledge. He has to be aware. He has to know what his role is. That's correct for aiding and abetting. Role in this conspiracy. Not his role as just a prepared doctor. Correct. Role in the conspiracy, where he fits in. Is it your position that that knowledge is constructive or actual? Well, it can be proved either way. And when we've alleged it, knew or should have known, we're alleging actual knowledge and alternatively, if not, the circumstances that are such that he should have known. Counsel have talked about attorney's obligation in a situation like this. The gender and black case that we have cited is one that says, yes, attorneys can be guilty of aiding and abetting. They set that standard and it's there. This is anecdotal, okay? But every time I go to a continuing legal education course, one of the things that they have a speaker speak on is, what do you do with an elderly or an infirm person that you believe might have a problem here? And why is that person being brought in? And they place, they tell me that I am supposed to make special inquiry. I'm not aware of any cases. I'm not aware of any statute. But that is what they tell me is the best practice for me as an attorney. Wouldn't one of the best indicators of his intent in 2013 is what he said in 2011 in that will, that he chose to disinherit Stephen? It is, but he did not say disinherit Stephen. Instead, he said equalize for my family. Okay. But I mean, in terms of an attorney looking at it, this is what he said in 2011. Essentially, that's what he's saying now. What further inquiry would you put on counsel to complete? Mr. Filler? Yes, I'm sorry. That counsel, my bad. He would really need to look at the whole situation, all of the circumstances. And he would, at the time that he was coming in in 2013, Lawrence Johnson was in very bad health. And it should have been obvious. In 2013, did he just come in to disinherit or get rid of Stephen, or did he affect other siblings? Well, in 2013, he was certainly under the undue influence of Carolyn. And I'm sure that Carolyn and Lawrence both told Jay Filler, no, we want to flush them all. We want to get rid of all of them. So 2013 wasn't just affecting Stephen. It was affecting more than just Stephen. Yes. You represent Stephen. I represent Stephen, Stephen alone. Okay. Thank you very much for your time. Thank you, counsel. At this time, the Court will take the matter under advisement and render a decision in due course.